Mr. Bloch, can you hear us and see us? I can hear you very well, and I can see you. Can you see me? We can. Can counsel see you? Okay, we're here for our argument, or re-argument, in White v. Ford Motor Company, a frequently seen case in our court. And we have the same panel as before, obviously, since this is the same appeal, and Judge Bloch is in Brooklyn. And since we weren't able to arrange an argument last week when Judge Bloch was in California, and he would have been willing to come down here, but since he didn't work out with counsel, we thought this would be an expeditious way of resolving the case. If there's any difficulty on anybody's part in hearing or seeing or understanding because of technology, do please speak up. We're still learning. Okay, we'll hear 50 minutes aside, unless there are a lot of questions, and we'll extend you. And I believe the Ford Motor Company goes first. You may proceed. Thank you, Your Honor. I'm Theodore J. Boutrous, Jr., representing Ford Motor Company. Malcolm Wheeler, who argued the last time around, is in trial, so that's why I'm here. I'm pleased to be here to argue these issues before the Court. The Supreme Court's decision in Philip Morris v. Williams makes it absolutely clear and removes any possible doubt, I believe, that the punitive damage verdict in this case violates due process. The theme of the Williams case was that courts must take precautions to avoid arbitrary jury-imposed punitive damage verdicts and to ensure that juries get proper legal guidance to make their decisions. And that is precisely what was lacking here in the second trial of the case. Can I help you focus your argument? We've all puzzled over Williams, I'm sure. It's so precise in the jury instruction it formulated for us. Not. But I do think the question, at least the question I have, is really the jury instruction that would have to be formulated after Williams. And what troubles me about both the instruction that you proposed in the district court and seem to be arguing for in your brief, and I'm referring now to your supplemental brief at page 4 and really the top of page 5, you said that the error was by refusing Ford's request to instruct the jury that punitive damages may not be imposed to punish Ford for harm to other parties or, and this is the problem I have with it, or for conduct relating to vehicles other than the one at issue in this case. How can that be in light of the fact that Williams specifically permits evidence of conduct with respect to at least similar conduct as part of the reprehensibility analysis? I think that goes right to the issue, Your Honor, of the use of the word punish. And so in the brief where we say punitive damages may not be imposed to punish Ford, and then jumping to the clause that Your Honor has pointed to for conduct relating to vehicles other than the one at issue in this case, I think that is perfect. That's what Williams says, that while that conduct may arguably be relevant to reprehensibility, the jury cannot say we are going to punish Ford for that conduct. Why not? That's what I believe that's what Williams says. We're talking about punitive damages. So what is the relevance then of reprehensibility? Well, I think Justice Stevens made that point. He said he viewed reprehensibility as folding in a punishment concept, but the majority said, no, there's a difference. When the jury in a punitive damage case sits, it is to decide how much to punish the defendant for the defendant's conduct as to that particular plaintiff relating to the harm to that particular plaintiff. And once it makes that decision or thinks about that issue, it can then consider other acts, arguably, as relevant to the reprehensibility and perhaps increasing the amount. In setting the amount. Increasing the amount. So how would a jury, I mean, I appreciate, as I said at the beginning, we don't have crystal clear, I don't get crystal clear guidance from Williams, but I think I know what they're trying to say. And when you say the jury should, as you did in the district court, the jury should be instructed that you can't punish Ford in a punitive damage award for harm, you say, for harm to other parties. That's what Williams says. Or for conduct relating to vehicles other than the one at issue. Isn't that the very nature of the inquiry on recidivism inquiry? That if the conduct has been repeated over and over, this conduct is, that's part of the reprehensibility analysis. What's the jury supposed to do with that, then? It can factor it into deciding the appropriate punishment for the defendant for the defendant's conduct as to that plaintiff. And this really was the issue in Williams. Well, how does that instruction, how would I get that as a lay juror? I'm having enough trouble. Maybe I'm no better than a lay juror. But that's so what? I mean, isn't that the problem, then? How is one going to parse the instruction as apparently you would on remand reformulate it again, I take it, as set forth in your brief? Is that what you're arguing for? That would be the instruction that you would ask for? That would be the instruction or some variant of it that the court, this Court or the district court, determine where appropriate. But, Your Honor, that, it is a concept that has some difficulties in pinning it down. That's, and it divided the Supreme Court. But the point is that the jury is bound to be confused. And I think there is a difference. If the jury thinks it's punishing Ford for its conduct towards third parties or for conduct towards third parties that caused them injury, I think it's the same thing. Then it might decide it must impose a punishment that's great enough to deter that conduct towards other people and as though it were sitting in judgment that Ford's conduct has to those other people. There may be other reasons. Let me interject from Brooklyn without shocking you too much. I wish I were with you today. But I'm looking at the Brooklyn Bridge now. We possibly can show you pictures of the Brooklyn Bridge after all our arguments. But I'm looking at the Ford's proposed instructions in the case at bar here. And I'm trying to square that with what now seems to be the law in light of Philip Morris. Would you agree with me, Counselor, that the instruction that you have proposed or you did propose doesn't square with the law as announced in Philip in so far as the fact that your proposed instruction in the court below did not separate or prescind between reprehensibility on the one hand and conduct, you know, in respect to non-parties? In other words, can I assume that the instruction that you proposed is not actually the law today and that the judge in not granting your request to so instruct the jury could not be considered to have made error? Your Honor, the answer is no for these reasons. First, Ford predicted what Williams ultimately held. And the district judge and plaintiff's counsel argued the district judge ruled that State Farm did not preclude punishment for third-party harm within the State, that State Farm really only related to extraterritorial conduct. But very simply, it just doesn't seem that your proposed instruction squares with the law. I mean, what you're arguing today may be one thing as to what you think an instruction should be, but that's not the specific instruction you requested. And it seems to me that the rejection of the instruction was not improper on the part of the district court because it did not completely articulate or clearly articulate the dichotomy that we now have to address. Two responses, Your Honor. First, the instruction – I think Flight 1 solves this problem. In footnote 69 of the – of Flight 1, the Court noted that Ford's proposed extraterritoriality instruction did not include the reprehensibility component. But the Court nonetheless said that Ford had come close enough in predicting what the Supreme Court ultimately would hold. In reverse for a new trial, plaintiffs could have argued that this conduct was relevant to reprehensibility. They could have proposed an instruction. But there's nothing wrong with the Court's charge. The Court did not charge the jury incorrectly. Your argument is that it did not go far enough by saying that you cannot, you know, ascribe harm to people in Nevada as well as extraterritorially. You never asked specifically for that charge. You never objected to the charge that was given. It strikes me that there's nothing wrong with the judge's charge, especially based on the evidence in the case. Your Honor, Ford did object to the charges. It asked several times for an instruction that would have precluded third-party harm on page 524 – 523 through 524 of the excerpts of record. Counsel made very clear the purpose of that instruction was to preclude the jury for punishing for third-party harm, whether it was in State or out of State. It asked for an instruction. It also asked for an instruction, a phrase that I don't think is even arguably incorrect, to be added to the Court's instruction that would have said, made clear that the punishment had to relate to Nevada's legitimate interest in punishment and deterrence, if any, for the wrongful conduct that harmed the plaintiffs in this case. That would have at least told the jury that it needed to focus on the harm to this plaintiff. So I think Ford did more than enough. Ford also objected to the arguments that Plaintiffs' Counsel had made, filed a motion in Lemonnet on this third-party harm issue, and amply preserved these arguments. Your Honor, the district court denied those motions, saying that Ford was misinterpreting the due process clause. There are two parts to objecting to the jury instructions. One of them is to raise an objection, to say, here's our problem, or here's my client's problem with the instructions. And the second part is offering a curative instruction, the kind of thing that one would like to have. And I've never fully understood the interplay between those two. I mean, let's say you make an objection, and I'm not necessarily speaking of your case, but in the general case, let's say you make an objection that is well-founded, but then the instruction you proffer to cure it maybe is not well-founded. It doesn't solve the problem or solves it. It just turns out not to be the right instruction. Is how — what is the interplay between those two? Do you lose your objection because the specific proffer doesn't satisfy the problem, or is the objection stand independent of the proffer to your instruction? I think in a case like this, it would stand independent, because for two reasons. First, Ford objected to the instructions as not correctly and fully stating the law. And that objection was fully preserved. It proffered an instruction that I think was well within the ballpark of what the Supreme Court ultimately held, and I think either of those two things were sufficient to preserve the objection. And especially when one looks at footnote 69 of White 1, where the Court said Ford's instruction wasn't complete. It didn't have everything that we would say should be in it. Let's say we want to agree with you. What's the remedy? I think there are two remedies. First, a new trial that would include an instruction on third-party harm along the lines of what was suggested in Williams. With some refinement, we've all learned something from — excuse me, along the lines of what Williams said. We've learned from that. We could refine it. But also, Your Honor, the compensatory damage award and the compensatory damage instruction, I think, would both have to be given to the jury on remand, a retrial on the amount of punitive damages. And — Well, that's another argument and another issue. I'm just saying, if this were the only — if we agreed with you on this — Yes. — and found this to be the only error, the Supreme Court seems to suggest in Philip Morris that at least the State Supreme Court, and presumably we stand in the shoes of the State Supreme Courts in a large or equal way, could perhaps fix a problem in front of State law by — or fix a problem, I gather, in front of State law by diminishing the multiplier or diminishing the amount of damages. I believe that would be an alternative, Your Honor. I think here, as Ford has argued, if you — one, the Court would purge the notion of punishing third-party harm in Nevada, outside Nevada, and reduce the — while we respectfully request the award should be reduced somewhere to the one-to-one or the two-to-one, maximum four-to-one range, what I think is the heartland of these — this ratio analysis. And I think that would be an alternative to factor in this third-party harm issue and further reduce the award. So I think that would be an alternative. And with the Court's permission, I'd like to reserve my last few minutes. Let me go — You said — I guess not. I try. We'll give you additional time, so long as there are questions. Judge Block, why don't you go first, and then I'll wait. Well, all right, fine. I want to get back to Williams, because there's the assumption in your comments that there was evidence of harm in Nevada. And when I read Williams, the Court talks about, we believe that where the risk of that misunderstanding is a significant one, because the instance of distorted evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury, a court, upon request, must protect against that risk. I'm not so sure I see a particular request here in any event, but you commented a little bit about preserving the record, and I have your thoughts about that. Where is there evidence in this case of any significance of harm to the citizens or residents of Nevada? When it comes to smoking, that's a no-brainer. We can assume that people smoke throughout the 48 or 50 states that we say. But in this particular case, it seems to me from looking at the record that the evidence of harm really is extraterritorial, and that was what was properly addressed by the Court. I don't see where there's any slam-dunk evidence of harm to Nevada citizens. Maybe you can enlighten me about that. Absolutely, Your Honor. I think the evidence of in-state and argument about wrongs to the people within state is overwhelmingly stronger than Williams. Let me give the Court an example. On pages 2 and 9 through 10 of the additional excerpts of record, plaintiff's counsel argued, they know there are not less than 54 people as of January 1999 who were injured from a roll-away. They know that Walter White was killed from that. God knows how many people, how many others are out there that they just haven't owned up to. Those 54 people, the exhibit, P237, which is at 128 through 32 of the supplemental excerpts of record, didn't distinguish where those injuries occurred, so the jury, there was a significant risk that the jury would have thought those people were in Nevada. That was aggravated by the fact that plaintiff's counsel argued, and this is just one example, I can't give them all to you, Your Honor, but in transcript page 1456 to 1557, this boy, Walter White, he was a person and there are other Walter Whites out there, and they're in Nevada because this is a state of trucks. And there are multiple examples like that. Plaintiff's counsel emphasized that Nevadans were at particular risk for this type of injury, and, therefore, there was more than a significant risk. Yes, Your Honor. Well, when we talk about risk on the one hand as compared to actual proof of harm on the other hand, look at page 1451 in the plaintiff's arguments in conclusion, specifically they're talking about reprehensibility. What strikes me as somewhat curious is on page 1542, plaintiff's counsel, Mr. Spector, then comments about what was raised by Mr. Wheeler in his argument. He says, let me also mention to you something that was said at the tail end of the speech, meaning Mr. Wheeler's comments, and it was this document as to how many vehicles were sold in Nevada during the relevant time period. And then he responds to something that Mr. Wheeler made reference to. It strikes me that on the plaintiff's summation, direct summation, he only speaks in terms of reprehensibility. Or, looking at the jury instruction in totality, can we not conclude that the jury was essentially instructed or spoken to about reprehensibility, and that the only comment about Nevadans was, as you mentioned, which doesn't seem to be squarely on point here when you talk about the risk as compared to the actual proof of harm? What do you say about that? I say no, Your Honor, because, first of all, that comment I read was one snippet. Secondly, that's exactly the argument that the plaintiffs made in the Williams case, that the jury would have known it was reprehensibility that was being referred to. The Supreme Court flatly rejected that argument, Your Honor, on the theory that there was a risk. The jury didn't understand the difference between reprehensibility and punishing directly for third-party harm. Here, because the jury was told that it could not punish for extraterritorial conduct and that that could only be considered for reprehensibility, there was a greater risk that it thought it could punish people for injuries suffered by people in action. Unless there was no real evidence to support a significant risk of harm to people in Nevada in this particular case, and also maybe you can comment upon the Supreme Court's statement that there must be a request to protect against that risk. So when these comments were made during concluding remarks, was there a request at all at that particular time? And should there not have been at that particular moment when these comments were articulated? Your Honor, there was a request for protection in those arguments. Ford's motion in limine number 9, which is document number 304 on the docket sheet, specifically sought to bar arguments regarding punishment of third-party harm. The district judge rejected that, denied it, saying that Ford was misinterpreting the due process clause. And under Rule 103, the rules of evidence, and under this, the Ninth Circuit's cases, that was sufficient to preserve those objections. You don't have to keep objecting. And similarly, as to Ford's motion number 12, motion in limine, which is docket number 307, Ford argued that Exhibit P237, which was the exhibit that talked about the 54 injuries and 1,100 incidents, should be excluded, along with other documents, because that related to third-party harm that did not relate to the harm to the plaintiffs in this case. The district judge denied that. That preserved the argument. Ford did not have to keep objecting. It put the district court and the Plaintiffs' Counsel and everyone on a notice that it objected this third-party harm argument. And its arguments were rejected. And that fully preserves it, Your Honor, under the rules of the case. But you still did not specifically ask for that in the instruction, which you proffered to the court. You had the opportunity to do that, and it doesn't seem as if that covers the waterfront. Well, Your Honor, the instruction, again, I think, you know, Ford predicted against able advocacy from the plaintiffs and against the district court's firm view that Ford was wrong. Ford kept pushing it. It proposed an instruction that said, You may not award punitive damages or increase the amount of punitive damage to punish the defendant for any other conduct with respect to any other vehicle. And they didn't. Yeah. But you don't present between reprehensibility there and punishment and harm to others. And you really do conflate the two in that particular instruction. How can you say the court was wrong in not giving it? And should you not have been more precise at that moment? I think quite one, footnote 69, resolves that, Your Honor. That was the same argument there. And we objected to the instructions that were given. I think that was sufficient to preserve this, this objection. And proposed an instruction that asked the court to tell the jury that it could not punish Ford for harm to past, present, or future harm to anyone other than the plaintiffs in that case. As things go, that is, I think, remarkably prescient to predict that the court would reach that point. And then Mr. Wheeler argued in his argument to the court that the reason that this was necessary was to avoid the risk that this jury will punish this defendant, not just for the harm to these plaintiffs, but for harm to other plaintiffs, whether in State or out of State. So everyone knew the issue. Ford laid it on the table. And there was plenty of information for the court to fashion a proper instruction. And I think that was more than enough to preserve the issue under the circumstances. I don't want to prolong this too much. I still want to get a clear understanding of your position. You keep talking about harm to others. The instruction that you proffered, what's in your brief and what you told us today says it has to not only say harm to others, but for conduct relating to vehicles other than the one at issue in this case. And I don't understand yet, and maybe on rebuttal you can give me an articulation of a proposed jury instruction that says at the same time we recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take that fact into account in determining reprehensibility. That's from Williams. And I don't know how they can possibly do that without knowing about conduct relating to vehicles other than the one at issue in the case, if that's — if I'm understanding your — Your Honor, I think we're on the same wavelength. And some of it flows from the language in Williams. But there's nothing — our argument was that even though that evidence might be admissible — and I'm not conceding it always will be, but just assuming it was admissible here — that conduct with respect to other vehicles and other people could come in for reprehensibility, the jury needed to be told that the purpose of that evidence was limited, that it could not punish Ford directly. That's what Williams says. For its conduct with respect to others. And it's another way of saying you may not punish Ford for its conduct that caused harm to others because the only punishable conduct would be that which caused harm to others. And I will, I guess, reserve the negative time I have left for rebuttal. Thank you. We'll hear from White. Thank you, Your Honor. Ken Inspector for the Whites. I'd like to make three points, Your Honors, if I may. Point number one, which has not been discussed until this moment, is that Judge Hagan gave a Williams-like charge to the jury, notwithstanding the state of the law at that time. Point number two, which has been discussed already amply, it seems to me, is that Judge Hagan did not request a Williams-like charge. And point number three is that the Whites' counsel, me, did not argue to the jury that they should punish for harms to non-parties. I did not make the argument that the Oregon counsel made. Oregon counsel, the counsel for the Williams family, argued about the smokers in Nevada, like his client, and that ran afoul of work. Was there some argument about how Nevadans are more likely to drive Tucks than people elsewhere? Yes, but we're talking now about risk, Your Honor, not about death. The issue about how people in Nevada were at risk goes to the issue of reprehensibility. You have 884,000 of these vehicles on the roadway, not just one, as Judge Fischer has pointed out, and everybody who's downhill of one of these vehicles is at risk. And that goes to the reprehensibility of Ford's conduct in not taking the vehicle off the road after all the information they had about how bad it was. I'm not sure I understand your point. You think it's more reprehensible to have people die in Nevada than to die in Massachusetts? Of course not, but that's not what I said. What's the point of talking about, you know, Nevadans drive Tucks more than, you know, those of us on feet east coast states? Because as Judge – I'm not sure that we're feet in the east, but as Judge Hagen – I think you'll say anything to get that jury on your side. I don't mean you personally. I'm talking about a – the first time, in part perhaps because of the argument of the Plaintiffs' Council, because that was an issue with this court, the first time we came up. I thought there was some argument like that. You guys in the west are more likely to drive trucks. I was – And you guys in Nevada. And I don't see how that goes to reprehensibility, how that doesn't go to anything other than – Because Judge Hagen charged the jury before we spoke. And Judge Hagen in his charge said that you must only award the amount necessary to vindicate Nevadans' interests in punishment and deterrence. And that comes out of the whole arc of cases that we have, going back to – Well, I think at that point I was – If I could just finish my thought. Going back to Gore and to Honda v. Oberg and TXO and more recently Campbell. And what he was saying was – Well, I control your extra time, so you can keep talking all you want. Finish that thought. I just wanted to finish my thought, if I could, Your Honor. Go right ahead. And so I'm only permitted to talk about – about in terms of the role of the jury in exacting punishment in Nevada's legitimate interests in punishment and deterrence. So they can only – they can – the jury can only circumscribe their award for Nevada's interests of Pennsylvanians such as myself or the interests of New Yorkers such as Judge Block. If I could come back, sir, to – Are you done? Did I ask my question? I think so, sir, yes. Okay. Now, if I can remember what the question was. Given this complicated thought you just articulated, why are they entitled under Williams to say, look, while they're doing that, what you have to make sure is that you don't punish them for harm to anybody else? You know, you just told me about Nevada. We told you about the pensibility and all those things, but you have to make sure you don't punish them for harm to anybody else. Why isn't that what Williams tells us? I'm sorry. I couldn't hear the question. Why isn't that what Williams tells us? I think Williams says essentially that. And let's look at what Judge Hagan actually said to the jury. We spent no time on that, but I think that's worth looking at. Judge Hagan said to the jury, in determining the amount of punitive damages, if any, reasonably required to vindicate Nevada's legitimate interest in punishment and deterrence, you may not add damages to protect people or to punish harm to people outside of Nevada. And in Judge Hagan's opinion, upholding the verdict, in footnote 17, what about inside Nevada? Could I just finish my sentence, sir? That wasn't my question. You're answering my question now. Look, the question is, they say, no, we want an instruction that makes clear that it doesn't, that you can't punish for harm to others, including others inside Nevada. There was no evidence, Your Honor, in this case of any harm to anyone inside of Nevada except for Walter White, who was killed, and to his parents, who grieved his loss. There was no evidence of any harm to anyone else. We put in evidence of eight injuries before Walter White's death, and we had reports of those injuries. And they were all specifically to people outside of Nevada. We had the vague notion of 54 injuries that were reported by Ford after the first verdict, after the evidence had been in the first trial that there had only been 53, which, of course, this Court incorrectly adopted in its first decision. But now there were 54 from a letter to NHTSA. But none of those 54 injuries were reported by Ford to have been to people in Nevada except for Walter White and his parents. So there was no evidence that pertained to that. If I could go back for a second to what Judge Hagan said in his opinion. In his opinion, in footnote 17, he said the jury was instructed not to, quote, add damages to protect people or to punish harm to people outside Nevada, unquote. This instruction goes beyond the requirements of State farm, parenthesis. Jury must be told not to punish, quote, action that was lawful in the jurisdiction where it occurred, unquote. So I think that it's relevant to go backwards for a moment and see what we were dealing with when this case was tried a second time. The case was reversed because Judge Hagan did not give a Campbell v. State farm instruction, even though, of course, Campbell had not occurred at that point in time. Now, the panel of this Court presciently foreshadowed what the Supreme Court would do in Campbell, and the mandate that it gave to Judge Hagan was very close to what the Supreme Court of the United States said in Campbell. But it actually went farther than Campbell, because that language that I just read to Your Honors that Judge Hagan articulated to the jury in his charge, that is on the last page of the opinion in White 1. He simply followed the instruction of this very Court in saying you may not punish for harm to people outside of Nevada or to protect people outside of Nevada. But isn't it true that at some point the Court asked for the phrase, inside or outside of Nevada? It's not in their – it's not in their proposed instruction, I don't believe. The – the – Kennedy, I'm looking at the 1271 of the transcripts. Mr. Wheeler, who produced that, that's Ford's attorney, sir. He said, my reading of State farm v. Campbell is that the principle that the Court was focusing on, and I believe permeates the opinion, is this. The Court was concerned that in a given case, let's take this one, that the jury, whether it's in State conduct or out-of-State conduct that harms other people, that this jury will punish this defendant in this case not just for the harm to these plaintiffs, but harm to other plaintiffs, whether in State or out-of-State. Right. That's a lawyer's argument, sir. That's not a – that's not a request for instruction. We have a procedure that the parties are to submit points of opinion. Well, that's – wait a minute. That's in – that's in the – that's dealing with Instruction 18. That may be a lawyer's argument, but when else are they supposed to be arguing about the instructions? You know, Your Honor, I don't think so. That's the instruction before the one you just – 19, which you read. Well, it seems to me that the answer is no. Why isn't that? I don't understand your point. He's arguing State farm and responding to the judge on Instruction 18. Let me just get that in front of you, Your Honor. I have Instruction 10 with me at my desk. And then he goes on to 19, and the court asks him, well, what would you – I suppose it's a bit of a blinder. Anyway, I've got the transcript. Your Honor, I don't have 18 or 19 in front of me. What I would say to the court – Well, 19 is the one you were reading from. I thought that I – well – Would you like the excerpts, if I could? Your Honor, of course. You can have the whole thing, or if you tell me what volume it is, I can – Just take the whole thing. I'm going to have my court counsel file it for you. That's always good. Can I just stop the clock for a minute here? Do you think you can find it in a – I'm stopping the clock and giving counsel a chance. There's no point in trying to have a conversation with Jeff Fisher if you don't have in front of you what he's looking at. Can I maybe speak on the excerpts from record 5.1 to 5.5? Mr. Boutros, do you want to show them where? If there are any markings in there, it's law clerks, not mine. My markings are Romanian. Judge Fisher, the – I'm sorry. You have the passage? Yes. Let's start up the clock again. But the problem I'm having is that I'm looking for the precise instruction that was requested. I'm not looking at the argument of counsel, which is what's at 5.23 and 5.5. I'm looking for the – what Judge Fisher referred to as instruction number 18 and number 19. Well, I'm just saying what the reference is. Mr. Wheeler, the next one is instruction number 18 you're on. Why don't you take the page that – just make sure you're on the same physical page as Judge Fisher, and then we can restart the clock. Judge Fisher, what – I'm looking at the transcript of the – apparently the arguments on settling instructions, and it's reporter's transcript 1270 at the top. I don't have any. Yes, Your Honor, and I thank the Court for your courtesy on this. Why don't we go ahead and restart the clock? Thank you. I thank you for your courtesy. No problem. My only point, sir, Judge Fisher, is this. I don't have Ford's requested instruction number 18 and number 19, which is referred to here. I see Mr. Wheeler's argument, so that if they put that into the requested instruction, Judge Fisher, then I would agree the issue was preserved. I certainly would agree with that. The question is whether that was in the requested instruction, and I don't have that with me, and it was not appended by Ford to its supplemental brief. They rested on instruction number 10 and number 14 and number 16, which is – which does not make the point that Mr. Wheeler made in his argument. But let's take all of that, Your Honor, in the – let's say 18 did request that The question is whether Judge Hagan's actual charge comported with due process. Well, here's – let me just – Yeah. At least this is what's troubling me. I – there's a lot of constraint imposed, understandably, by Judge Hagan, because he was implementing this Court's mandate on extraterritoriality. I understand that's what everybody was focused on. The question, it seems to me, is whether by design or happenstance, the convergence of the extraterritoriality, the limitation, as you say, on what you put into evidence and the instructions as given, functionally gave Ford enough of what it would be entitled to had Williams been on the books, which it wasn't. So the question is, as I – at least as I'm reading the instructions, it seems clearly to rule out, through the instruction you read, the jury looking at evidence outside the state of Nevada. No doubt about it. Right. And so then the question, is there any implication either in the instruction or any evidence to support it if the jury somehow thought they could look to Nevada-injured folks, that that ball of potential conflict with Williams was either there or it wasn't there? And that's what I'm trying to figure out. And I agree with the way Your Honor is approaching the issue. Judge Hagan's charge was fair both pre-Williams and post-Williams. There was no evidence of any Nevada citizen who was harmed, aside from the whites. I didn't argue in my closing you should punish for harms to people outside of Nevada. I didn't argue you should punish for harms to people inside Nevada, aside from the whites. So while – while Williams is – it seems to me an important case in the jurisprudence of punitive damages, it is not an important case vis-à-vis the consideration by this Court of White v. Ford because of the way this case was actually tried by Judge Hagan and by the arguments that were made by counsel. And I really – I mean, I think it's as simple as that. There was a Williams-like charge given by Judge Hagan. There was no Williams-like charge requested by Ford. And I apologize to the Court. I don't have 18 and 19 in front of me. I see them referenced by Judge – by Mr. Wheeler. But if I just go on what counsel appended to his brief, which were charges, I believe, 10, 12, and 14, nothing in there is Williams. And finally, plaintiff's counsel didn't make the kinds of arguments that were made by the lawyer for the Williams family up in Oregon in the Philip Morris case. May I say one more thing before I sit down? And that is this. I know this Court is wrestling with this issue and with all the other issues in this case. But there is another important issue, it seems to me, the Court, I believe, ought to be considering, and that's the issue of what is the natural inference that Ford is to draw from what's occurred in this case, both with respect to what occurred in the trial court system and also in the appellate court system. It has been 15 years, Your Honors, since the conduct that gave rise to the jury's finding of malicious conduct occurred. And it's been 13 years since Walter White was killed. And it's been 13 years since these vehicles were recalled. And yet Ford has not faced any punishment for what occurred here. And it just seems to me that the argument that Ford makes about Williams is a very tortured argument. It is, to my view, the equivalent of a legal semicolon. Yet in the big picture of this case, we have the Ford Motor Company acting in a way that the jury found to be malicious, resulting in the death of a young child. We had lots of other people around the country who were injured, which goes to reprehensibility, not to the amount to award, but reprehensibility. And we had the chief engineer for Ford on this break testifying. I know you do. If I could just finish my thought. In 2004, the vehicle still should be. You made the same argument in your brief, in your supplemental brief. We know how long it's taken. So I don't think you're aiding your cause at this point. I have a couple of other questions I wanted to ask you, but I didn't want to interrupt you. Anyway, let's say we disagree. And I'm going to ask you the same question, or a same question that I asked your opposing counsel. Let's say we were to disagree with you about the error, and we also were to disagree with you that the error was harmless. So let's imagine that we think that Williams instruction was required and not given here. What would be our options if we reached that point in our analysis? Well, if you believe that the wrong charge was given, and if you believe that it rises to the level of a deprivation of Ford's constitutional rights, and if you believe, unlike the Supreme Court believed in Williams. You don't need to restate my question. I remember what it was. I just said it. I believe my colleagues do remember my question as well. Let's say we disagree with you on that. We find the error harmful. What is the remedy? What do we do next? Order a new trial. Please don't restate the question. Order a new trial. Order a new trial. You don't think that we have either authority or we should exercise discretion if we have authority to simply ratchet down the multiplier? No. I mean, if Ford was deprived of the constitutional right, if it were, then it seems to me that that is jurisprudentially separate from the consideration of what's the appropriate amount of damages. I would have thought so too until I read the Supreme Court's suggestion in Williams that one thing that Oregon Supreme Court might do is to ratchet down the multiplier. So until I read that statement, I would have thought that what you just articulated was the only rational thing to position. I'm not being facetious at all here. Nevertheless, we have a statement from the United States Supreme Court that suggests that ratcheting down the multiplier is one way that a State Supreme Court might proceed. Is there any reason why that kind of option isn't open to us? I did not imbue their comments with the meaning that Your Honor just suggested. And I don't believe that that is available to the Court. I believe these issues are separate. Let me ask you a question on a wholly different subject, or a somewhat different subject. And that is that I remember there was an issue in this case as to the fact that the district judge did not instruct the jury as to the degree of thought, contributory thought, the degree of thought on the Williams' part. And do you have... I'm sorry, in the white spot, it's a W word. Do you have Williams before you, or can I call your attention to a passage that I'd like you to address? I'm looking at the slip opinion. I'm looking at Roman numeral three. It starts on slip opinion five. I'm looking specifically at the first paragraph under three. Are we on the same page? I think so. You can go ahead and read that. Or I can ask my question, then you can read it. Please. Okay. The Supreme Court, one of the reasons the Supreme Court gives for saying that it is a denial of due process to base compensation on harm suffered by third parties is that defendants in that case deprived in essence to show that those third parties assumed the risk or acted in wrongful ways on their own. Now, why isn't that directly applicable to our case? Why doesn't that say that as a matter of due process in sending punitive damages, the fire effect must know about the state of mind or the degree of misconduct or the assumption of the risk or contributory negligence or so like, that that is an aspect of due process in sending punitive damages? And if that's the case, why isn't that passage directly applicable to our case? Judge Kaczynski, the passage that you just cited doesn't have any relation to our case, because the passage that you cited was Justice Breyer explaining the folly of allowing a plaintiff to talk about harms to third parties where we don't litigate in that courtroom what those harms to third parties may have been caused by. For example, in the smoking contest, you could argue that there were a million people that were killed in Oregon or other states from smoking, but many of those people may have known full well about the harm of smoking and the like and voluntarily I'm not finished with my answer, though, so I think you'll see that I understood it as I finish. In White v. Ford Motor Company, the Whites prevailed on three legal bases. They prevailed on negligence, they prevailed on failure to warn, and they prevailed on intentional misrepresentation. For the last two of those bases, under Nevada law, the negligence of the Whites does not reduce their reward. So their reward, in the eyes of the law, is unreduced in any respect to whatever negligence they had as irrelevant. So it would not be... I'm referring to it as a matter of actual damages, but why doesn't this passage tell us it's a matter of punitive damages, where you're really measuring things like wrongfulness of the conduct, culpability. And a central component is knowing the other side of the equation, what is the culpability of the plaintiff as well. But that goes to the question of whether those other deaths, for which there would be a legal defense to those deaths. If we said the other deaths, other million deaths around the country from smoking were legally indefensible on the basis of assumption of the risk, for example, then you would not be getting into the individual facts in those cases because there would have been a finding by a legislature or by a court that that was irrelevant as a matter of law. But that, of course, is not the case. We do hold, everywhere in the United States, that you may assume the risk of your own harm. I don't think so. I don't think in California you do. We have a comparative negligence state. I'm proud of it. We don't have it. We don't have it. That just goes to your point, though. We wouldn't be able, for Californians who died, to see the extent to which they were comparatively negligent because we wouldn't be getting into all those individual facts or those individual plaintiffs outside that courtroom. But if the courts, if the legislature in California said that in a smoking matter, for smokers do not, cannot be adjudicated comparatively negligent, okay, if they die, it's as a result of cigarette smoking, they have a claim for damages, then it would be that, at least on the issue of reprehensibility, it would be relevant whether other people in California did die from cigarette smoking. Justice Breyer's point is, well, we don't know whether there were legally available defenses in those situations. Well, in White v. Ford, we do know. There were no legally available defenses in those other cases. I don't think he says legally available defenses. And it would be very hard to do that because you don't exactly know what defenses particular other plaintiffs in other situations might have. But anyway, I think I understand your answer. I think you're exactly right. We don't know, and therefore it's not fair to speculate. In White v. Ford, we do know that the latter two of the claims the Whites prevailed on, their own conduct is not a legal defense. So it's therefore irrelevant. The second jury should not have been told it. Thank you. Unless there are other questions from my colleagues. Mr. Boutrous, we'll give you a couple minutes for rebuttal. Thank you, Your Honors. First, on that last point, Judge Kuczynski, I think it's absolutely correct that in this case, Ford was not allowed to put on every available defense to the Whites' claims because of the instructions that were given at the beginning of the case that didn't tell the jury. What's its defense? Well, it would be a defense to the amount of the punitive damages, arguing that the confluence of circumstances, the contributory negatives, it doesn't bar the claim, it doesn't reduce the claim here, but it goes to the culpability of Ford. And Ford was precluded from telling the jury that the first jury had found that. Same with the confessatory damages. Ford wasn't able to argue the most fundamental thing in a punitive damage case, that the jury needed to tether its punitive damages to the plaintiff's harm in this case and the damages in this case. And that goes back to the questions that Judge Fischer was asking about the instructions and to Judge Block's question. Ford made two requests for jury instructions on this third-party harm issue. On page 523 of the ER where Judge Fischer was pointing to, relating the instruction 18, that was the court's instruction 18. And Ford, Mr. Wheeler, specifically asked to augment that instruction with a simple phrase that would have said the punishment must relate to the harm to the plaintiff in this case. Then he explained the third-party harm concept that he was advocating, which is explicitly what was adopted in the Williams case. I don't see why it's not. Mr. Woodward, if I may, back here in Brooklyn, if I just may shift the focus for a minute, there is no constitutional due process violation here in respect to the harms to others charged or the absence of specificity, that it's not just extraterritoriality we're talking about, but the judge should have mentioned no harm to the pardons as well. Do you agree or disagree that constitutional violations can nonetheless be assuaged or counteracted by the harmless error doctrine in this case? I don't think so in this case, Your Honor, because the Supreme Court in Williams said that if there is a risk of jury improperly punishing a defendant for third-party harm, and the defendant asks that that risk be cured, then there's a due process violation. I don't think it could be. Well, be that as it may, I sit on many habeas criminal cases, and many times we apply harmless error analysis to constitutional violations of all sorts. And there are a few cases where the harmless error doctrine does not apply in the constitutional context. Assume that harmless error analysis can be applied, notwithstanding this constitutional violation. Would you agree or disagree that there's not a surfeit of evidence here which rises to the level of harmfulness? In other words, I only see eight incidences of harm. They are all specifically to those outside of Nevada. We have this general kind of document about 54 others. How many are in Nevada? How many are outside of Nevada? There's no particular evidence about it. Could we not, if we embrace the concept of harmless error, say that in this particular case, whatever constitutional violation happened was really harmless based upon the evidence or the lack thereof in this case? No, Your Honor. I think this was extremely harmful error. It wasn't just this amorphous 54-people document. Counsel hammered that document. And again, Your Honor, this wasn't like their might. I don't see such hammering. I see Mr. Wheeler raising the issue, and counsel was suspected of responding to it in rebuttal. In one part. But here's what, Your Honor, this was devastating. He said, again, this wasn't speculation. This boy, Walter White, he was a person. There were other Walter Whites out there. And they're in Nevada. Walter White died. And he says they're out there and they're in Nevada because this is a state of Oregon. And he goes on. And he says, and I want to make sure I make this point because, Judge Block, you were pointing to the differences between this case and Philip Morris. Here's what the lawyer in Philip Morris said. This is right out of the opinion. He told the jury, quote, to think about how many other Jesse Williams in the last 40 years in the state of Oregon there have been. In Oregon, how many people do we see outside driving home smoking cigarettes? Mr. Spector almost mirrored that. He said, they know there are not less than 54 people who were injured from a rollaway. They know Walter White was killed from that. God knows how many others there are they haven't owned up to. He didn't say outside Nevada. He said one or the other. I understand that. That's the lawyer's argument. Maybe it's hyperbolic. But can you really seriously compare smoking to driving these pickup trucks, really? Well, I don't think you can, Your Honor, out of context. That's why we believe that this punitive damage award is grossly excessive. But he was making the comparison. He was arguing that these pickup – these trucks were killing people left and right in Nevada, and that the jury should punish them. No evidence of that. I respectfully disagree, Your Honor. I didn't know I would disconnect him, but I disagree. I've never had the last word in that. Have we lost audio as well as video? Yes. Well, maybe we should adjourn then. I think this may be a good note. Okay. Thank you. Thank you, Your Honor. We are adjourned. Thank you, Counsel. Thank you.
judges: Kozinski, Fisher , Block